

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

NATIONAL CASUALTY COMPANY,

          Plaintiff

v.

ROBERT G. PEGG and PEGG & PEGG, LLP.,
POLLY PRATT GREEN O'DONOGHUE, ARDEN
MOULTON, TRACEY WHITNEY, ANTHONY
MOULTON, JR., TRACEY MOULTON, WADE
WHITNEY, DEVON WHITNEY, EDWARD WHITNEY,
THE POLLY PRATT GREEN TRUST f/b/o ARDEN
MOULTON, THE POLLY PRATT GREEN TRUST f/b/o
TRACEY WHITNEY, THE POLLY PRATT GREEN
MARITAL DEDUCTION TRUST, THE POLLY PRATT
GREEN O'DONOGHUE LIVING TRUST, THE
POLLY PRATT GREEN O'DONOGHUE AND JOHN
O'DONOGHUE MARITAL TRUST, LYME COMPANY,
FRANKLIN B. KIRKBRIDE, INC., KIRKBRIDE ASSET
MANAGEMENT, INC., TOCQUEVILLE ASSET
MANAGEMENT, LP, ROTHSTEIN KASS, STUART
BENDER, PREMIER FOODS, INC., FIFTH AVENUE
ICE CREAM, INC., CONEY ISLAND HOT DOGS, INC.,
VINCENT BONOMO, FRANK BONANNO, THEODORE
J. VITTORIA, JR., VITTORIA & PURDY LLP.

          Defendants

Case No.

05 CV 7110

JUDGE BAER

RECEIVED
AUG 1 1 2005
U.S.D.C. S.D. N.Y.
CASHIERS

COPY

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, NATIONAL CASUALTY COMPANY ("NATIONAL CASUALTY"), hereby

seeks a Declaratory Judgment pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of

Civil Procedure for the purposes of determining a question of actual controversy between the

parties, whether NATIONAL CASUALTY has a duty to defend and pay defendants ROBERT

G. PEGG ("PEGG") and PEGG & PEGG, LLP ("PEGG & PEGG") in the underlying lawsuit

captioned <u>Polly Pratt Green O'Donoghue, et al v. Robert G. Pegg, et al.</u>, (Superior Court of New Jersey Law Division: Mercer County; Docket No: MER-L-1290-05) ("Lawsuit").

## PARTIES

1.      At all pertinent times, NATIONAL CASUALTY was, and still is, a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business in Arizona.

2.      Upon information and belief, defendant PEGG is a registered investment advisor who during the past fifteen years has been affiliated with, or worked for, defendants Franklin B. Kirkbride, Inc. and Kirkbride Asset Management, Inc.  At one time, PEGG was the president of Franklin B. Kirkbride and Kirkbride Asset Management.  Upon information and belief, Tocqueville Asset Management, LP is a successor in fact to either or both Kirkbride Asset Management or Franklin B. Kirkbride.  Through these entities, PEGG, and others who he has supervised, provided financial and investment advisory services to the plaintiffs. These defendants maintain, or have maintained, offices in New York City.  PEGG is also an accountant licensed by the State of New York and at one time managed and operated PEGG & PEGG, an accounting firm in New York City. (Defendants PEGG, PEGG & PEGG, Lyme Company, Franklin B. Kirkbride, Kirkbride Asset Management and Tocqueville Asset Management are collectively referred to herein as the "PEGG DEFENDANTS.")

3.      Upon information and belief, defendant PEGG & PEGG is an accounting firm with offices in New York City.

4.      Defendant Lyme Company is a company created by defendant PEGG.  Upon information and belief, defendant PEGG is the sole owner of the Lyme Company.  Upon information and belief, Lyme Company maintains offices in New York.

3

5.      Defendant Polly Pratt Green O'Donoghue is a resident of Princeton, New Jersey, and was married to Edward Green. They had two daughters, Arden Moulton and Tracey Whitney. Mr. Green died in September 1991. In 1995, Ms. O'Donoghue married John O'Donoghue. Presently, Ms. O'Donoghue is 85 years of age.

6.      Defendant Arden Moulton is a daughter of Polly Pratt Green O'Donoghue and Edward Green. Ms. Moulton was married to Anthony Moulton, who died in 2003. Ms. Moulton resides in New York City. Ms. Moulton has two children, defendants Anthony Moulton, Jr. and Tracy Moulton, both of whom are residents of the City of New York.

7.      Defendant Tracey Whitney is a daughter of Polly Pratt Green O'Donoghue and Edward Green. Tracey Whitney and her husband Wade Whitney, reside in Keene, New York. Tracey and Wade Whitney have two children, defendants Devon Whitney and Edward Whitney, who are residents of New York.

8.      Defendant The Polly Pratt Green Marital Deduction Trust was a New Jersey trust created under the provisions of the Last Will and Testament of Edward G. Green, which Will was dated June 29, 1990. Defendant PEGG was the trustee of this trust.

9.      Defendant The Polly Pratt Green O'Donoghue Living Trust and The Polly Pratt Green O'Donoghue and John O'Donoghue Marital Deduction Trust were created on or about January 3, 2002. Defendants PEGG and Theodore Vittoria were Trustees of these Trusts.

10.     On December 28, 1990, Polly Pratt Green created two trusts, one for the benefit of Tracey Whitney and the other for the benefit of Arden Moulton. These trusts are known as the Polly Pratt Green Trust f/b/o Arden Moulton, and the Polly Pratt Green Trust f/b/o Tracey Whitney. These trusts referred to herein as the Arden Moulton Trust and the Tracey Whitney

4

Trust, respectively. Defendant PEGG was the Trustee of both of these trusts. The trust agreements were prepared by Theodore Vittoria at Vittoria & Parker.

11.     Defendant Theodore J. Vittoria, Jr. is an attorney at law in the State of New York, and served as trustee with PEGG for several trusts created by or for the benefit of the plaintiffs.

12.     Vittoria is a partner or principal of defendant Vittoria & Purdy LLP, a law firm with office in New York. Vittoria and Vittoria & Purdy provided legal services to plaintiffs.

13.     Defendant Rothstein Kass is an accounting firm, and maintains offices in many states, including New York. Defendant Stuart Bender is licensed certified public accountant employed by Rothstein Kass and, upon information and belief, works at Rothstein Kass's office in Roseland, New Jersey.  Mr. Bender and Rothstein Kass provided accounting and other services to the limited partnerships in which plaintiffs invested. (Bender and Rothstein Kass are referred to herein as the "Accounting Defendants.")

14.     Defendant Fifth Avenue Ice Cream, Inc. is, upon information and belief, a corporation. Fifth Avenue was to act as a general partner, and manage and operate, various franchises in which plaintiffs invested. Upon information and belief, Fifth Avenue maintained offices in Fairfield, New Jersey from 1989 through at least 2001.

15.     Defendant Premier Foods, Inc. is a corporation and, upon information and belief, maintained offices in Fairfield, New Jersey from 1989 through at least 2001.

16.     Defendant Coney Island Hot Dogs, Inc. is a corporation that, upon information and belief, is owned or controlled by Defendants Vincent Bonomo and/or Frank Bonnano, and maintained offices in Fairfield, New Jersey.

17.     Defendants Vincent Bonomo and Frank Bonanno are individuals who, upon information and belief, own or control Fifth Avenue Ice Cream, Inc. and Premier Foods, Inc.,

and who participated in, directed and/or orchestrated, the scheme perpetrated by the defendants. Upon information and belief, Mr. Bonomo resided in Far Hills, New Jersey until 2002, and currently maintains an office in West Caldwell, New Jersey.  Mr. Bonanno resided in New Jersey until 2001.  (Fifth Avenue, Premier, Coney Island, Mr., Bonomo and Mr. Bonanno are collectively referred to herein as the "Fifth Avenue Defendants.")  The Fifth Avenue Defendants were general partners of the partnerships in which plaintiffs invested.

## JURISDICTION AND VENUE

18.     This court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

19.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## NATURE OF THE CLAIM

20.     This is an action for Declaratory Judgment pursuant to 28 U.S.C. § 2201 for the purpose of construing and interpreting the terms of an insurance contract and for a determination of the rights and obligations, if any, of the parties arising from the insurance contract issued by NATIONAL CASUALTY to PEGG & PEGG.  NATIONAL CASUALTY seeks a declaratory judgment declaring that it does not have a duty to defend or pay PEGG or PEGG & PEGG in connection with any of the claims alleged in the underlying Lawsuit.  An actual controversy exists regarding the issue of coverage under the insurance policy.

## THE NATIONAL CASUALTY POLICY

21.　　NATIONAL CASUALTY issued PEGG & PEGG an Accountants Professional Liability Insurance (Claims Made) Policy, Policy No. ATO 0000519 ("Policy"), for the period September 1, 2004 to September 1, 2005. A true copy of the Policy is attached hereto as "EXHIBIT A."

22.　　The "INSURING AGREEMENT" of the policy provides as follows:

### *INSURING AGREEMENT*

*WE will pay DAMAGES which YOU become legally obligated to pay as a result of CLAIMS first made against YOU during the POLICY PERIOD or Extended Reporting Period, if applicable, provided that:*

*1.　　The WRONGFUL ACT giving rise to the CLAIM occurred on or after the RETROACTIVE DATE shown in the Declarations and on or before the end of the POLICY PERIOD;*

*2.　　Notice of the WRONGFUL ACT was not given nor required to be given to any prior insurer; and*

*3.　　Prior to the inception date of the first policy issued to YOU by US and continuously renewed by US, YOU had no reasonable basis to believe that such WRONGFUL ACT had been committed or that a CLAIM would be made against you alleging such WRONGFUL ACT.*

(*Italics Supplied.*)

23.　　The "DEFENSE" section of the Policy provides as follows:

### *DEFENSE*

*WE have the right and duty to defend any suit against YOU seeking DAMAGES because of a WRONGFUL ACT even if any of the allegations in the suit are groundless, false or fraudulent.*

　　　　　　*　　　　　　　　*　　　　　　　　*

*If the allegation(s) is excluded under this policy, there shall be no duty to defend such CLAIM.*

(*Italics Supplied.*)

24.    The "DEFINITIONS" section of the Policy provides as follows:

## DEFINITIONS

*1.    **CLAIM(S)** - means an oral or written notice from any party that it is their intention to hold **YOU** responsible for any **WRONGFUL ACT**.   **CLAIM** also means **YOUR** knowledge of circumstances which could reasonably be expected to give rise to such notice.  **YOU** must tell **US** of such **CLAIMS** or circumstances in writing during the **POLICY PERIOD** or Extended Reporting Period, if applicable.  Notice includes, but is not limited to, service of suit or institution of arbitration, mediation or any other Alternative Dispute Resolution proceedings.*

*12.    **PROFESSIONAL SERVICES** — means services:*

> *a.    Performed in the practice of public accountancy for others, including but not limited to those ser vices of personal financial planning performed by a Certified Public Accountant (CPA) or  consulting: or*

> *b.    Performed for others:*

> *1.    As an executor, administrator or personal representative of an estate or as a trustee, while also rendering services as an accountant, and except as otherwise excluded;*

> *2.    As a member of a formal accreditation, standards review or similar professional board of committee related only to the accounting profession; and*

> *3.    As an arbitrator, mediator or notary public.*

*19.    **WRONGFUL ACT(S)** - means any actual or alleged negligent act, error, omission or any alleged **PERSONAL INJURY OR ADVERTISING INJURY** offense **YOU** or any person or entity for whom **YOU** are legally responsible commit, but only in the performance of **PROFESSIONAL SERVICES** for or on behalf of the **NAMED INSURED** or the **PREDECESSOR FIRM(S)**;*

*20.    **YOU** and **YOUR** – means Insured and includes:*

> *a.    The **NAMED INSURED** and any **PREDECESSOR FIRM(S)***

> *b.    Any individual:*

8

(1)      *Who is currently or becomes an officer, director, partner, stockholder, shareholder or employee of the **NAMED INSURED**, including leased personnel under **YOUR** direct supervision, during the **POLICY PERIOD**, but only for **CLAIM(S)** resulting from **WRONGFUL ACTS** committed within the scope of their employment by the **NAMED INSURED** or its **PREDECESSOR FIRM(S)**.*

(2)      *Who was formerly a officer, director, partner, stockholder, shareholder or employee of the **NAMED INSURED**, or its **PREDECESSOR FIRM(S)**, but only for **CLAIM(S)** that result from **WRONGFUL ACTS** committed within the scope of their employment by the **NAMED INSURED** or its **PREDECESSOR FIRM(S)**.*

c.      *Any accountant or accounting firm while rendering or failing to render **PROFESSIONAL SERVICES** pursuant to a specific contract with the **NAMED INSURED**.*

d.      *The estate, heirs, executors, administrators, assigns and legal representatives of anyone listed in a. and b 1. & 2. above in the event of their death, incapacity, insolvency or bankruptcy, but only to the extent that they would otherwise be provided coverage under this policy.*

(Italics Supplied.)

25.    The "EXCLUSIONS" section of the Policy provides as follows in pertinent part:

### EXCLUSIONS

*This policy does not apply:*

*1.      To any **CLAIM** based upon or arising out of any dishonest, fraudulent, criminal, malicious or intentional **WRONGFUL ACT(S)** committed by **YOU**;*

*3.      To any **CLAIM** based upon or arising out of **YOUR** capacity as an officer, director, partner, trustee, shareholder or employee of any entity other than the **NAMED INSURED**;*

*4.      To any **CLAIM** arising out of **PROFESSIONAL SERVICES** or advice rendered by **YOU** in connection with any business enterprise not shown on the Declarations;*

*11.     To any **CLAIM** based upon or arising out of **PROFESSIONAL SERVICES** performed by any of **YOU** as*

9

*executor, administrator or personal representative of an estate or as trustee if any of YOU or YOUR spouse is a beneficiary or distribute of the estate or trust.*

*13.      To any CLAIM based upon or arising out of any actual or alleged violation of any laws, rules or regulations concerning anti-trust, restraint of trade, price fixing, kickbacks, fee splitting, illegal rebates, copyright, deceptive trade practices and conspiracies regarding deceptive trade practices.*

*14.      To any CLAIM based upon or arising out of a recommendation, promotion, solicitation or sale of a tax shelter, real estate or other investment;*

*16.      To any CLAIM based upon or arising out of the formation, administration or operation of a syndicate, limited partnership or joint venture;*

*17.      To any CLAIM based upon or arising out of non-monetary damages including, but not limited to injunctive relief, declaratory relief or any other non-monetary recovery or relief;*

*18.      To any CLAIM based upon or arising out of or involving any commingling, conversion, misappropriation or defalcation of funds or other property;*

*20.      To any CLAIM based upon or arising out of any representations, warranties or guarantees as to the future value of an investment;*

*21.      To any CLAIM based upon or arising out of the performance of services which requires a license or certification as an attorney, insurance agent or insurance broker or registered representative or broker/dealer;*

*23.      To any CLAIM based upon or arising out of personal profit or advantage to which YOU are not legally entitled.*

(Italics Supplied.)

## NATIONAL CASUALTY'S RESERVATION OF RIGHTS

26.      On June 9, 2005, NATIONAL CASUALTY sent PEGG and PEGG & PEGG a reservation of rights letter. In this letter, NATIONAL CASUALTY agreed to provide, through separate defense counsel, a defense to PEGG and PEGG & PEGG.  It also reserved all its rights

under the policy and applicable law, including the right to deny coverage for any judgment or settlement, whether the policy terms or applicable law were specifically mentioned in the letter or not. A copy of the reservation of rights letter is annexed hereto as <u>EXHIBIT B</u>.

27.    On July 18, 2005, NATIONAL CASUALTY served a supplemental reservation of rights letter on PEGG and PEGG & PEGG. A copy of this supplemental reservation of rights letter is annexed hereto as <u>EXHIBIT C</u>.

**THE UNDERLYING LAWSUIT**

28.    The Underlying Lawsuit was filed on or about May 12, 2005. A copy of the Complaint in that action is annexed hereto as <u>EXHIBIT D</u>.

**A.    The Relationship Between the Parties**

29.    The Complaint alleges the relationship of the parties to be as follows. In the late 1980's, PEGG became the President of Kirkbride, Inc. and the trusted family advisor of Edward and the plaintiff Polly Green. During this time, PEGG also served as investment advisor for the plaintiffs Arden Moulton and Tracey Whitney, as well as on behalf of their then minor children, plaintiffs Anthony Moulton, Jr., Tracey Moulton, Devon Whitney and Edward Whitney. *(Complaint. at ¶ 32-33.)* PEGG also served as a trustee of numerous trusts involving the plaintiffs. *(Id. at ¶ 34.)* During the 1990's through 2002, PEGG and PEGG & PEGG provided accounting services to the plaintiffs, including preparing their tax returns. *(Id. at ¶¶ 35-36.)*

30.    Fifth Avenue was the general partner of at least some of the limited partnership investments recommended by PEGG to the plaintiffs in which the plaintiffs invested. It is alleged that the Fifth Avenue Defendants obtained nearly $10 million in administrative fees, as well as significant other payments and fees from the partnerships, while the plaintiffs lost virtually their entire $3.5 million investment. *(Id. at ¶ 24.)*

11

**B.     The Gravamen of the Complaint**

31.     The Lawsuit seeks to recover damages for the pattern of tortious conduct relating to the plaintiffs' finances and investments from 1989 through 2004. The gravamen of the Complaint is that PEGG, the plaintiffs' trusted investment advisor, financial consultant, partner, trustee, accountant and friend, enthusiastically recommended that the plaintiffs invest in a number of limited partnerships. In doing so, PEGG assured the plaintiffs that these investments would be profitable, safe, secure and redeemable at any time. Based on these representations, the plaintiffs invested nearly $3.5 million in these partnerships. PEGG's representations and assurances were false and the partnership investments were unsuitable for the plaintiffs. As a result, the plaintiffs lost nearly their entire investment (everything but $520,000.00) while the PEGG DEFENDANTS and the Fifth Avenue Defendants received significant payments, fees and other benefits from the limited partnerships. *(Complaint at ¶¶ 19–20, 25-26, 30-34, 141, 165.)*

32.     The partnerships were set up so that the PEGG DEFENDANTS and other defendants were the only ones that could, and did, benefit. This was done by the PEGG DEFENDANTS manipulating the books and records of the partnerships in order to maximize gross sales and eliminate cash flow. This benefited the PEGG DEFENDANTS and harmed the plaintiffs because the significant administrative fee paid to the PEGG DEFENDANTS was calculated from the gross sales from the franchises of the partnerships. By contrast, the plaintiffs were entitled to distributions from cash flow, but many of the partnerships did not distribute all the cash flow they had received from the operating companies. The PEGG DEFENDANTS also avoided making distributions to the plaintiffs by causing the partnerships to make interest-free loans to affiliates of the defendants. On other occasions, the PEGG DEFENDANTS caused the partnerships to retain cash instead of distributing it to the investors. Over the years, the PEGG

DEFENDANTS received hundreds of thousands of dollars for investment advisory fees from the plaintiffs. *(Id. at ¶¶ 21- 22, 142, 155.)*

### C.   The Limited Partnerships

#### 1.   The Almond Company

33.   PEGG recommended that the plaintiffs invest in a New Jersey general partnership entitled the Almond Company which would be investing in eight Haagan Daaz ice cream shops. The Almond Company would be owned 50% by investors and 50% by defendant Lyme Company ("Lyme"), a company apparently owned by PEGG even though PEGG was not contributing any money or making any financial investment for that interest. PEGG, through the Lyme, would manage, control and make all decisions on behalf of the partnership. PEGG explained to the plaintiffs that the Almond Company would use the money invested by the investors to acquire a 50% interest as a limited partner in each of the eight Haagan Daaz franchises. The remaining 50% interest in the eight franchise stores would be owned by Fifth Avenue as general partner, even though Fifth Avenue would not be investing any money to acquire its interest in the franchises. The investors would own 25% of each of the ice cream franchises. PEGG, through the Lyme, would own 25% of each of the franchises, and Fifth Avenue would own 50% of the franchises. *(Id. at ¶¶ 38-41, 43-44.)*

34.   PEGG explained to the plaintiffs that they could expect to receive three types of payments for their investment. First, he represented that each investor would receive return of the principal amount of their investment within 40 months based on the projected cash flow of the stores. Second, PEGG represented to the plaintiffs that they were to receive 25% of the monthly cash flow that remained after the investors were repaid their contributions. Third, PEGG explained that as limited partners, the plaintiffs would be entitled to proceeds from the sale of franchises, if and when they sold. Based on historical data, PEGG represented that a $125,000.00

investor would receive $87, 500.00 from the sale of all eight franchises and that this money would be in addition to the monies received in repayment of the initial investment and in addition to the share of surplus cash flow received. *(Id. at ¶¶ 47-53.)*

35.     PEGG informed the plaintiffs that Fifth Avenue, although it contributed no cash to the partnership, was to receive, as an "administrative fee", 12% of the gross sales for the first two years, and then 10% of gross sales thereafter. He also explained that Fifth Avenue was to receive 50% of the cash flow after the monthly repayment of $3,125 to the investors. However, PEGG failed to state whether the administrative fee owned to Fifth Avenue was to be paid before or after the payment derived from cash flow, or available cash flow, that was owed to the investors in repayment of their initial contribution. PEGG also represented that, even though Lyme contributed no cash to the investment, it was to receive 25% of the cash flow each month after the monthly repayment of $3,125 to the investors. He further explained to the plaintiffs that he, through PEGG & PEGG, would be providing accounting services to the limited partnership and would be receiving fees for those services. He did not estimate the amount of those fees. *(Id. at ¶¶56-59.)*

36.     PEGG recommended this investment to the plaintiffs without qualification on August 1, 1989 and assured them that they could redeem their investment at any time. Based on these unqualified representations, plaintiffs Arden Moulton and Tracey Whitney each invested $125,000 in the Almond Company in 1989. *(Id. at ¶¶ 61-64, 82.)*

### 2.     The Albacore Company

37.     On or about March 1, 1990, PEGG identified a second limited investment opportunity, the Albacore Company ("Albacore"), a New Jersey partnership that would be owned 50% by investors and 50% by Lyme. Albacore was solely authorized to invest as a limited partner in five Nathan's Famous Hot Dog stores. The partnership would own 50% of the

franchises with the remaining 50% being owned by Fifth Avenue. The investors would collectively own 25% of the franchises. PEGG would receive fees for accounting services performed and Fifth Avenue was going to receive 10% of the gross sales as an administrative fee, up to a maximum of $50, 000 per year per store. *(Id. at ¶¶66-67.)*

38.    PEGG represented that investors would expect to receive the same three types of payment for their investment in Albacore that were expected from an investment in Almond: repayment of contribution, additional cash flow and proceeds from the sale of the franchises. PEGG, however, anticipated that the return on the investment in this partnership would be even greater than an investment in Almond. He explained that an investment in Albacore would be repaid in less than three years even though he predicted that the Almond investment would repay in 40 months. PEGG explained that it would be reasonable to expect that an investment of $125,000 would receive $37,500 per year in repayment of the initial contribution and $12,500 in additional cash flow, over and above the repayment of the initial investment. He also projected that the $12,500 in yearly income should continue for the ten year lease on a store. PEGG had anticipated $7,250 in additional cash flow for a comparable investment in Almond. He also explained that if and when the stores were sold, the investors would receive 25% of the sales price and that if each of the five stores was sold for $700,000, each investor of $125,000 would receive $87, 500. *Id. at ¶¶ 69-72.)*

39.    PEGG failed to disclose to the plaintiffs a number of significant, although subtle, differences in his description of Albacore from Almond. These differences centered on PEGG and the other defendants receiving even greater benefits from Albacore than Almond even though the defendants' obligations to Albacore were less. One difference was that investors in Albacore would receive between 77.5% and 92.55% of the cash flow each month until

repayment of their initial investment, with the rest of the cash flow being paid to Lyme and Fifth Avenue. In comparison, in connection with the investment in the Almond, Lyme and Fifth Avenue were to receive nothing until the monthly thresholds were reached for repayment of the initial investment. Another difference between the two partnerships related to the profits to be provided to Lyme and Fifth Avenue. For Albacore, neither Lyme nor Fifth Avenue were to invest any money to obtain their investment in the franchises. Rather, they both were to contribute "most" of their taxable share of profits to the extent necessary to repay the initial investments. In comparison, in connection with Almond, Lyme and Fifth Avenue were to invest their entire taxable share to repay the initial investment. *(Id. at ¶¶74-78.)*

40.    PEGG recommended the investment in Albacore to each of the plaintiffs without qualification and the plaintiffs Arden Moulton, Tracey Whitney and Polly Pratt Green O'Donoghue each invested $125,000 in Albacore based on PEGG's recommendation. At the time PEGG solicited the plaintiffs to invest in Albacore on March 1, 1990, he knew, although the plaintiffs did not, that the plaintiffs' investment in Almond had failed to return any monies to the plaintiffs. To induce the plaintiffs to invest in Albacore, PEGG decided not to disclose this fact to the plaintiffs. Notwithstanding the March 1, 1990 solicitation letter, PEGG, unbeknownst to three investors, had already invested in Albacore on their behalf as of November 15, 1989. *(Id. at ¶¶81-84.)*

### 3.    Other Limited Partnership Investments

41.    During the same time frame, and continuing through 1990 and 1991, PEGG invested the plaintiffs' assets in other limited partnerships that, in turn, invested in the franchises. In total, plaintiffs invested in the following four limited partnerships that essentially were holding companies that, in turn, each invested in an operating partnership that owned and managed franchises:

16

- Almond Company that, in turn, invested in Apricot Company;
- Albacore Company that, in turn, invested in Apple Company;
- Berry Company that, in turn, invested in Best Company; and
- Buns Company ( a limited partnership that invested in Nathan Famous Hot Dog stores) that, in turn, invested in Boardwalk Company.

42.     PEGG also invested the plaintiffs' assets in a limited partnership known as Cafe that was not set up in two tiers, but consisted of just one layer. The general partners of Apricot, Apple, Best, Boardwalk and Café were defendants Bonomo, Bonanno, Fifth Avenue, Premier Foods and/or Coney Island. *(Id. at ¶¶ 85-87.)*

43.     PEGG made investments for the plaintiffs in various limited partnerships without providing to plaintiffs any information concerning the investment and without seeking, or obtaining, the plaintiffs' authorization for such investments.  He also withheld information from the plaintiffs about these investments and the plaintiffs did not know that they had invested $3.5 million in these partnerships until September 16, 2003. *(Id. at ¶¶ 91-92, 168.)*

44.     Although PEGG knew that the plaintiffs' investments in Almond, Albacore and Buns during 1989 and 1990 had failed to earn any distributions, PEGG invested the plaintiffs' assets in other limited partnerships in 1991 (Buns) and 1992 (Café) instead of redeeming or recommending the redemption of the investments in Almond, Albacore and Buns. He also made additional investments in Buns in 1994 and in Café in 2001 without the knowledge of the plaintiffs. PEGG caused the additional investment to be made in Buns even though he knew that the plaintiffs had already invested approximately $3.4 million in these partnerships that the franchises had not performed as PEGG represented, and not one of the partnerships had provided any appreciable return on the investment. *(Id. at ¶¶ 93-99, 177-179.)*

45.     PEGG used this additional investment by plaintiffs in Buns in 1994 to enable another investor to redeem her limited partnership interest in Buns for $82,509. This redemption

17

of an investment by one of the limited partnerships was not an isolated occurrence. From the 1990's through 2002, a number of other investors redeemed their investments in the limited partnerships. On some occasions, Lyme or Fifth Avenue provided additional capital to enable the redemption. In each instance, the partnership interest was obtained by the defendant at a discount. In addition, each of the partnership interests that Bonomo and Bonanno obtained from other investors were, in turn, redeemed by Premier in 1999 and 2000. Premier went out of business in 2003. Thus, Bonomo and Bonanno were able to invest and obtain cash from the partnership, and to effectively transfer their personal loss to a company that went out of business. None of the defendants, including the PEGG DEFENDANTS, notified the plaintiffs that other limited partners were seeking to redeem their limited partnership interest and recover their investment, or that Lyme and Fifth Avenue were providing capital to enable the redemptions. PEGG did not recommend that the plaintiffs should redeem their investments. All the investors in the limited partnerships in which they had invested were clients of PEGG and/or his investment firms. PEGG never disclosed that redemption by one limited partner affected each of the other limited partners. He also failed to provide information to the plaintiffs about their investments in order to delay the plaintiffs from redeeming their investments. When the plaintiffs sought to redeem their investments in the limited partnerships in 2002 and 2003, PEGG informed them that there were not sufficient funds for him to return the proceeds to the plaintiffs. He also made false representations to the plaintiffs about their investments in a September 16, 2003 letter in order to stall the plaintiffs from asserting their rights. *(Id. at ¶¶ 100-109, 156, 170-176, 183-189.)*

### 4.    Accounting Irregularities By The Fifth Avenue Defendants

46.    Numerous questionable financial entries and accounting practices were employed in connection with the partnerships. Perhaps most noteworthy was the existence of large amounts

of cash in some of the entities, and the mysterious disappearance of that cash. The balance sheets also reflected numerous questionable entries related to assets that were due from related entities or liabilities that were owned to affiliates. The Accounting Defendants admitted that numerous "plug" number entries on the balance sheets were "simply made up" and that the balance sheets for the partnerships were "not accurate." The Accounting Defendants also admitted that the tax returns for the operating partnerships contained schedules that were "erroneous and contrived." Moreover, despite all the monies loaned by the partnerships, the partnerships had virtually no interest income or expenses. The absence of interest income suggests that monies were loaned interest free. Questionable entries also related to accounts payable, the sale or disposal of the partnerships assets in 2003, the expenses purportedly incurred by the partnerships, the expenses attributable to payroll taxes, the $9.7 million in administrative fees taken by Fifth Avenue, the failure of the partnerships to earn income during most years. The questionable accounting practices call into question the accuracy of all the financial statements which, in turn call into question the calculations for determining the distributions provided to each of the investors. In particular, the Fifth Avenue Defendants' use of one paymaster enabled them to manipulate the profits and losses attributable to the partnerships, which, in turn, enabled them to manipulate the cash flow available for distribution to investors. *(Id. at ¶¶ 110-132, 137-139.)*

47.     The financial statements of the partnerships provide evidence of suspicious activity regarding the activities and operations of the franchises. This evidence suggests that Premier Foods and Fifth Avenue commingled assets among the various partnerships. This was done by the Fifth Avenue Defendants, with the approval of the PEGG DEFENDANTS, loaning or transferring money out of more profitable partnerships and providing the money to less profitable partnership. The result of these transfers appears to be that rather than distributing the

cash flow derived from the profitable partnerships to the investors, the Fifth Avenue Defendants and the PEGG DEFENDANTS used that cash flow to prop up the underperforming partnerships in order to continue to receive their substantial fees. *(Id. at ¶¶ 195, 197-198.)*

48.    Although PEGG, an accountant, regularly and contemporaneously reviewed the financial statements relating to the partnerships and raised questions about their accuracy with the Accounting Defendants and the Fifth Avenue Defendants, he never advised the plaintiffs of his knowledge concerning the partnerships or the wisdom of having the plaintiffs continue their investments in these partnerships. PEGG failed to take these steps because he was concerned that redemption by one of his clients might harm another client. *(Id. at ¶¶ 131 -135, 139.)*

### 5.    The Trusts

49.    PEGG was the trustee of the Arden Moulton Trust and the Tracey Whitney Trust. He was also an executor of the estate of Edward Green who died in 1991. PEGG and his companies, received significant fees from the estate, including fees for accounting services. PEGG was also the sole trustee of Polly Green Marital Deduction Trust, which was created in the early 1990's. In the 1980s and the 1990s, PEGG & PEGG provided accounting services to the plaintiffs and prepared their tax returns. PEGG took payment for his accounting services directly from the plaintiffs' investment accounts that he managed. *(Id. at ¶¶ 143-147.)*

50.    PEGG, in his dual capacities as trustee and investment advisor, and defendant Theodore J. Vittoria, Jr. ("Vittoria"), an attorney, in his role as trustee, mismanaged the assets of the plaintiff O'Donoghue's trusts. From 2001 through 2003, these accounts incurred losses of approximately $2.67 million, while PEGG took in approximately $230,000 in commissions and fees from Ms. O'Donoghue's accounts. Much of the losses in O'Donoghue's accounts were caused by many of the investments being unsuitable for O'Donoghue. *(Id. at ¶¶ 162-164.)*

### D.     Legal Claims

#### 1.     Securities Fraud

51.     Count I is a claim for securities fraud brought under the New Jersey securities fraud statute, N.J. Stat. § 49:3-52, 53, 60, 71. It is based on PEGG and the PEGG DEFENDANTS intentionally making false and misleading statements of material and significant facts to the plaintiffs to induce them to invest in the limited partnerships. The false and misleading statements are alleged to include the income projections for the partnerships, the representations about the ability to redeem the investment at any time, the expected time to receive a return of capital, statements about the defendants contributing most of their taxable share of profits and the additional capital that would be provided to the plaintiffs. Count I also alleges that PEGG failed to disclose that the administrative fees to be paid to the general partners would be paid before any distributions were paid to the investors, that the partnerships were set up such that it would be unlikely that the investors would recoup their investment, that the partnership intended to make interest free loans to affiliates of the defendants, that the other investors in the partnership would exclusively be clients of PEGG, and the existence of any risks in investing in the franchises or limited partnerships. *(Id. at ¶¶ 203-207, 210.)*

52.     Count I further alleges that, for each investment made following Almond, the PEGG DEFENDANTS intentionally failed to disclose: that prior investments had not achieved their projections; factual information relating to franchise sales or business projections; the status of franchise stores; revised or updated projections or estimations for the return of the plaintiffs' investments; that other limited partners were redeeming their investments; that the source for the redemptions were either the PEGG DEFENDANTS or the Fifth Avenue Defendants; and that the PEGG DEFENDANTS and Fifth Avenue Defendants were not contributing their taxable share of the profits to repay the initial investment. *(Id. at ¶¶ 208-210.)*

21

53.     Count II alleges that the defendants violated additional sections the same New Jersey securities fraud statute by employing a scheme to defraud the plaintiffs. *(Id. at ¶¶213-215.)* Count III alleges a violation of this statute on account of the defendants' failure to register or provide a prospectus for each of the limited partnerships in which the plaintiffs registered. *(Id. at ¶¶ 216-222.)* Count IV alleges that the PEGG DEFENDANTS are secondarily liable for securities fraud under the New Jersey statute because PEGG had control over Lyme and Kirkbride. *(Id. at ¶¶ 223-227.)*

### 2.     Negligence/Unsuitability

54.     Count V alleges a claim for negligence/unsuitability against the PEGG DEFENDANTS. This claim is based on the allegation that the limited partnership investments were not suitable for the plaintiffs. *(Id. at ¶¶228-233.)* Count VI alleges a claim for negligence/unsuitability against the PEGG DEFENDANTS based on the investment advice given to O'Donoghue in connection with her trust assets. *(Id. at ¶¶ 234-239.)*

### 3.     RICO

55.     Count VII and Count VIII allege New Jersey RICO (N.J. Stat. § 2C:41-1 (2005)) claims against the PEGG DEFENDANTS. These claims are based, *inter alia,* on the PEGG DEFENDANTS alleged fraudulent statements regarding the investments and manipulation of the books and records and financial activities of the partnerships. *(Id. at ¶¶ 241-248.)*

### 4.     Breach of Fiduciary Duty

56.     Count IX alleges a claim for breach of fiduciary duty against the PEGG DEFENDANTS in their capacities as advisor, trustee, limited partner and accountant. The count alleges that the PEGG DEFENDANTS breached this duty by: having the plaintiffs invest in the partnerships; failing to recommend that the plaintiffs redeem their investments in the limited partnerships; permitting and condoning the manipulation of the partnerships' finances; approving

questionable financial and accounting practices by the Fifth Avenue Defendants and the Accounting Defendants. Count IX also alleges that the PEGG DEFENDANTS breached their fiduciary duties to the plaintiffs by failing to disclose numerous material facts concerning the partnerships. *(Id. at ¶¶ 249-256.)* Count X alleges a breach of fiduciary duty claim against PEGG in his capacity as trustee for several trusts of the plaintiffs. The count alleges that PEGG breached this duty by advising the plaintiffs to have these trust make unsuitable investments in the partnerships. *(Id. at ¶¶ 257-264.)* Count XI alleges a claim for breach of fiduciary duty as trustee against the PEGG DEFENDANTS. This claim is based on the PEGG DEFENDANTS benefiting from the partnership investments at the expense of the plaintiffs. *(Id. at ¶¶ 268-274.)*

### 5.    Breach of Duty/Conflicts of Interests

57.    Count XIII alleges a claim for "Breach of Duty (Conflict of Interest)" against the PEGG DEFENDANTS in connection with their recommendations that the plaintiffs invest in the limited partnerships. The alleged conflicts include PEGG not informing the plaintiffs that: only his clients had invested in, or would be investing in, the partnerships; he was a 50% limited partner in each of the partnerships; he advised some of the plaintiffs to make additional investments in the partnerships to enable another investor to redeem her investment; the fees paid to the PEGG DEFENDANTS and the Fifth Avenue Defendants were greater than the distributions being paid to the plaintiffs for their investments. *(Id. at ¶¶ 279-288.)*

### 6.    Fraud and Negligent Misrepresentation

58.    Counts XV and XVI are claims for fraud and negligent misrepresentation against the PEGG DEFENDANTS based on their investment advice. The factual predicate for these claims is similar to that set forth in Count I. *(Id. at ¶¶ 295-307.)* Count XVII is another claim for fraud against the PEGG DEFENDANTS. It alleges that the Accounting Defendants manipulated the books and records of the partnerships and, thereby, limited distributions made to the

investors. Count XVII also alleges that the PEGG DEFENDANTS knew and/or approved of this manipulation of the finances for the partnerships and acted with the intent to benefit themselves and harm the plaintiffs. *(Id. at ¶¶ 308-313.)* Count XVIII alleges that the PEGG DEFENDANTS aided and abetted the fraud.

59.    Count XIX is a claim for conspiracy against the PEGG DEFENDANTS. The alleged conspiracy is that the Fifth Avenue Defendants, the PEGG DEFENDANTS and the Accounting Defendants agreed to perpetuate the fraudulent scheme of keeping the franchises running to benefit themselves at the expense of the plaintiffs' investments. *(Id. at ¶¶ 318-321.)* Count XX is a claim against the PEGG DEFENDANTS for fraud inducement. It is based on the statements made to the plaintiffs about the investments and the intentional omission of material facts that should have been made to the plaintiffs. *(Id. at ¶¶ 322-324.)*

### 7.    Contract and Quasi-Contract Based Claims

60.    Count XXI is a claim for breach of contract against the PEGG DEFENDANTS. It is based on the PEGG DEFENDANTS failure to monitor the franchises and the limited partnerships, to provide plaintiffs with material information concerning the franchises and limited partnerships, and to discuss the significance of this information with the plaintiffs. *(Id. at ¶¶ 325-328.)* Count XXII is a claim for breach of the implied covenant of good faith and fair dealing contained in each of the agreements between the plaintiffs and the PEGG DEFENDANTS. *(Id. at ¶¶ 329-331.)* Count XXIII is a claim for unjust enrichment against the PEGG DEFENDANTS. *(Id. at ¶¶ 332-336.).* Count XXVII is a claim against PEGG seeking the rescission of the release signed by the plaintiff O'Donoghue. *(Id. at ¶¶ 354-358.)*[1]

---

[1] A number of the Counts do not involve the PEGG Defendants. These are Count XII (breach of duty of loyalty by the Fifth Avenue Defendants), Count XIV (breach of duty – conflict of interest – against Fifth Avenue Defendants), Count XXIV (malpractice/professional negligence against Accounting Defendants), Count XXV

## COUNT I – DECLARATORY RELIEF

61.    The allegations of Paragraphs 1-60 are repeated and incorporated herein by

reference.

62.    There is no coverage under the NATIONAL CASUALTY Policy because:

a.    The claim alleged in the Lawsuit were not first made during the POLICY PERIOD.

b.    Notice of the WRONGFUL ACT(S) was given or required to be given to a prior insurer.

c.    Prior to the inception of the policy, PEGG and PEGG & PEGG had a reasonable basis to believe that the alleged WRONGFUL ACTS had been committed and that a CLAIM would be made against them alleging such WRONGFUL ACTS.

d.    PEGG  is not an Insured under the policy because the CLAIMS alleged against him did not result from WRONGFUL ACTS committed within the scope of his employment by PEGG & PEGG;

e.    PEGG and PEGG & PEGG are not alleged to have committed WRONGFUL ACTS(S) because the Complaint does not allege that they committed a negligent act, error or omission or any alleged PERSONAL INJURY OR ADVERTISING INJURY offense in the performance of PROFESSIONAL SERVICES for or on behalf of PEGG & PEGG.

f.    The exclusions set forth in paragraph 25, *supra* apply to the claims alleged in the Complaint and exclude coverage.

WHEREFORE, NATIONAL CASUALTY respectfully requests that this Court enter a

judgment declaring the rights, status and obligations of the parties under the Policy, including but

not limited to, there being no coverage under the NATIONAL CASUALTY policy for PEGG

and PEGG & PEGG, NATIONAL CASUALTY being permitted to withdraw its defense of

PEGG AND PEGG & PEGG and NATIONAL CASUALTY having no duty to defend or pay

PEGG and PEGG & PEGG for the following reasons:

---

(malpractice/profession negligence against Vittoria and Vittoria & Purdy) and Count XXVI (breach of fiduciary duty against Vittoria and Vittoria & Purdy )

a.    The claim alleged in the Lawsuit were not first made during the POLICY PERIOD.

b.    Notice of the WRONGFUL ACT(S) was given or required to be given to a prior insurer.

c.    Prior to the inception of the policy, PEGG and PEGG & PEGG had a reasonable basis to believe that the alleged WRONGFUL ACTS had been committed and that a CLAIM would be made against them alleging such WRONGFUL ACTS.

d.    PEGG is not an Insured under the policy because the CLAIMS alleged against him did not result from WRONGFUL ACTS committed within the scope of his employment by PEGG & PEGG;

e.    PEGG and PEGG & PEGG are not alleged to have committed WRONGFUL ACTS(S) because the Complaint does not allege that they committed a negligent act, error or omission or any alleged PERSONAL INJURY OR ADVERTISING INJURY offense in the performance of PROFESSIONAL SERVICES for or on behalf of PEGG & PEGG.

f.    The exclusions set forth in paragraph 25, *supra* apply to the claims alleged in the Complaint and exclude coverage.

NATIONAL CASUALTY also requests that this court provide it with such further relief as it deems necessary and proper, including, but not limited to, an award of attorneys' fees and costs in favor of NATIONAL CASUALTY.

                                        **NATIONAL CASUALTY COMPANY**
                                        By its attorneys


                                        _____
                                        Gerald P. Dwyer, Jr. (GD-0329)
                                        Richard J. Guida (RG-5147)
                                        ROBINSON & COLE, LLP
                                        885 Third Avenue – Suite 2800
                                        New York, New York 10022
                                        212-451-2990
                                        emails: gdwyer@rc.com
                                                rguida@rc.com

Dated:  8|10|05